RITA LANGENHORST, as Special Adm'r of the Estate of Gerald Langenhorst, Deceased, Plaintiff-Appellee, v. NORFOLK SOUTHERN RAILWAY COMPANY *et al.*, Defendants-Appellants.

Fifth District    No. 5—02—0459

Opinion filed December 15, 2004.

1104

Kurt E. Reitz and Heath H. Hooks, both of Thompson Coburn, L.L.P., of Belleville, for appellants.

Thomas Q. Keefe, Jr., of Belleville, for appellee.

JUSTICE KUEHN delivered the opinion of the court:

The two Norfolk Southern Railway Company crossbucks that bracket railroad crossing 724641H, and warn of its existence, cast their shadows 26 miles east by northeast of the St. Clair County courthouse. The crossbucks stand about nine miles closer to the Clinton County courthouse.

This seemingly unimportant geographical difference in reference to the courtrooms of two adjacent counties became important when Rita Langenhorst chose to file this wrongful death action in St. Clair County, instead of Clinton County. Widow Langenhorst lives in Clin-

ton County, only 500 feet from the Clinton County crossing that claimed her husband's life.

Because the accident that led to Gerald Langenhorst's death occurred in Clinton County, because Rita Langenhorst lives in Clinton County, and because a number of potential witnesses hail from Clinton County, Norfolk Southern Railway Company (Norfolk Southern) and several of its employees claim that a defense of this action in a St. Clair County courtroom will inconvenience them. They prefer to litigate in a Clinton County courtroom, maintaining that a trial in Clinton County will better serve the ends of justice than a trial in the forum that widow Langenhorst prefers.

When the railroad and its employees asked St. Clair County Circuit Judge Lloyd Cueto to transfer the case, he refused to do so. Judge Cueto concluded that the reasons behind the defendants' plea for a more convenient courtroom did not *strongly favor* their desired transfer to Clinton County.

Norfolk Southern and its employees petitioned us to allow an immediate interlocutory appeal of the ruling pursuant to Supreme Court Rule 306 (166 Ill. 2d R. 306). We denied the petition. The defendants then petitioned the Illinois Supreme Court for its review of the ruling. Our high court denied the defendants' request for leave to appeal but used its supervisory power to order our reconsideration of the matter in light of two recent supreme court decisions—*Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 797 N.E.2d 687 (2003), and *First American Bank v. Guerine*, 198 Ill. 2d 511, 764 N.E.2d 54 (2002). *Langenhorst v. Norfolk Southern Ry. Co.*, 205 Ill. 2d 586, 796 N.E.2d 1053 (2003). This interlocutory appeal ensued.

We must determine whether Judge Cueto abused the exercise of his discretion when he refused to allow the defendants' request for a transfer to Clinton County. We only find such an abuse if we conclude that "no reasonable person would take the view adopted by [Judge Cueto]." *Dawdy*, 207 Ill. 2d at 177, 797 N.E.2d at 696.

Regardless of where it will be told, this lawsuit's story will speak to human tragedy. The accident that led to Gerald Langenhorst's death took place on the Langenhorst farm. The farm is located several miles west of Germantown, Illinois, on the southwestern edge of Clinton County. It rests only a few miles east of St. Clair County's eastern border. For that reason, the farm is just about as close to Belleville, Illinois, as it is to Carlyle, Illinois, the county seats of St. Clair and Clinton Counties.

Belleville and Germantown are sister cities, with a common heritage. German immigrants settled in this region of southern Illinois during the nineteenth century.

The Langenhorst family has drawn sustenance from the farm, and renewed itself there, for generations. Anthony and Ann, offspring of Rita and Gerald's union, grew up there, just like Gerald before them. And all the while, a set of Norfolk Southern railroad tracks ran right through the middle of the farm. The rails were laid long ago. Iron horses, pulling freight-laden carriages, have thundered through the Langenhorst cornfields ever since.

In the waning hours of a bright summer afternoon in 2001, Norfolk Southern lead engine 8812, lugging 118 cars of freight, rumbled across southern Illinois from west to east at approximately 45 miles per hour. Shortly before the five o'clock hour, it rolled onto the Langenhorst farm.

The tracks that traverse the farm cross Woodlawn Lane, the country road that leads to the Langenhorst farmhouse. The crossing is only about 500 feet from the front porch of the house. The farmhouse is so close to the tracks that it vibrates and rattles every time a train rumbles by. Anyone inside the house can feel a train's approach.

The farm's inhabitants have to cross the tracks all the time. Gerald Langenhorst had bounced a lifetime of vehicles over crossing 724641H. He crossed it almost every day of his 70-year life upon Mother Earth.

On July 27, 2001, the last day of that life, Gerald headed home for the supper that Rita customarily prepared for him. It was the Langenhorst family way to gather for early evening suppers right after the completion of the day's labors. Rita had prepared meals like it long before the years had retouched the color of her hair.

Rita awaited Gerald's arrival, periodically looking down the old country road for Gerald's approaching Chevy pickup truck. Rita did not know it, but she and Gerald would not dine upon the evening meal that she had cooked that day.

Rita noticed the train's approach. Shortly thereafter, at precisely 4:49 p.m., Rita heard the sound that a Norfolk Southern diesel engine makes when it rams the side panel of a 1993 Chevy 1500 pickup truck while traveling along at approximately 45 miles per hour. As she rushed from the farmhouse, she could hear the clanging of freight cars as the train's engineer did his best to bring his 118-car carriage to a stop. He managed to still the train before the twenty-eighth freight car of that carriage passed the crossing.

The freight cars that had passed the crossing obscured the fresh wreckage of Gerald's ravaged vehicle from Rita's view. She could not see it or Gerald, who had been tossed 85 feet from his truck. Gerald lay in a field on the other side of the train, alive and conscious.

Gerald was rushed to St. Joseph's Hospital in Breese, Illinois. He

was able to give his version of events to the emergency room doctors who treated him.

The doctors at St. Joseph's Hospital believed that Gerald's back was broken and that the fracture had injured his spinal cord. Gerald had no feeling or movement in his legs. He also suffered from a concussion and from multiple rib fractures with associated contusions that resulted in impaired breathing and hypoxia.

St. Joseph's Hospital was not equipped to treat Gerald's neurological injuries. After a brief stay at St. Joseph's Hospital, a helicopter rushed Gerald to St. Louis University Hospital for more intensive medical care. Before Gerald left, he and Rita shared their final word. Rita hugged and kissed Gerald, and whispered that she loved him. She told Gerald that she would see him in St. Louis.

The doctors at St. Louis University Hospital could not save Gerald. At 7:15 p.m., Gerald Langenhorst perished due to the injuries that he had sustained. The earlier collision at the crossing on his farm marked the beginning of the end of Gerald's life. Gerald's death gave birth to this lawsuit. Here is what happened after Gerald was laid to rest.

Rita Langenhorst hired Tom Keefe to champion her and her family's interests. On October 22, 2001, Keefe drove the mile or so from his law office in Fairview Heights to the St. Clair County courthouse in Belleville. He filed this action on behalf of the Langenhorst heirs, suing the railroad, the railroad employees who operated the train that killed Gerald, and the division engineer who maintains Norfolk Southern crossings, including crossing 724641H.

The complaint was served upon Norfolk Southern's registered agent for the State of Illinois, an attorney who lives and works in Belleville. After the railroad received the notice of the lawsuit, it hired Thompson Coburn LLP to defend it and its employees. Thompson Coburn LLP assigned Kurt Reitz as lead trial counsel for its clients. Reitz's office is located about eight blocks west of the St. Clair County courthouse.

In late January of 2002, Reitz filed a verified motion to transfer venue based upon the "Doctrine of Forum Non Conveniens." Reitz filed a supplementary affidavit in support of the motion. St. Joseph's Hospital medical records that spanned over a decade of medical care provided to Gerald Langenhorst accompanied the affidavit. The first 24 pages were devoted to the treatment administered immediately after the July 27 collision. They revealed the existence of two potential witnesses—two physicians who work at St. Joseph's Hospital. Dr. Keith Thomae was Gerald's primary emergency medical caretaker at the Breese facility. Dr. David Sorge assisted Thomae.

Reitz also supported his motion with widow Langenhorst's answers to interrogatories. Those answers set forth the names of several family friends and relatives who might bear witness to the quality of Rita and Gerald's union in life. They also contained the names of three neighbors who were at the scene of the accident. None of the neighbors heard a warning whistle prior to the accident. All of the friends, relatives, and neighbors are people who live in or around Germantown and Albers, Illinois, small Clinton County communities in close proximity to the Langenhorst farm.

On May 22, 2002, Reitz filed the affidavits of defendants Ellis, Baggett, and Egmon. Each of them swore that it would not inconvenience them to appear in Clinton County for the trial of this case. In the affidavits, the three defendants did not mention the inconvenience of St. Clair County. Reitz verified the following as a "list of witnesses" who hail from Clinton County:

Rita Langenhorst.
Deputy C. Becherer.
New Baden Ambulance.
Germantown fire department.
Albers City Ambulance.
Breese Ambulance Service.
St. Joseph Hospital.
Robke Auto Body.

Given this list, it is presumed that there are ambulance personnel, hospital personnel, firefighters, and auto body repair personnel who can give some form of evidence in the case. We are not told who those people are, where they live, or what kind of testimony they might provide relevant to those issues expected to be litigated.

Finally, Reitz filed the Administrative Office of the Illinois Courts year 2000 civil litigation statistics for St. Clair and Clinton Counties. The statistics provide a measure of respective court congestion, by recording the number of newly filed civil cases for the year 2000, the number of cases disposed of in the year 2000, and the average delay from filing to verdict, on a county-by-county basis.

On June 12, 2002, Judge Cueto conducted a hearing on the requested venue transfer. During those proceedings, he commented upon the statistical three-year average delay between the filing of a lawsuit and the trial of that suit in St. Clair County. He insisted that the three-year average delay does not express involuntary delay, incident to congested civil court dockets in St. Clair County. According to Judge Cueto, delay does not have to accompany the filing of any major civil suit in St. Clair County. Declaring that he could easily provide an imminent trial date to anyone who was really ready for a trial, Judge Cueto observed as follows:

"Hardly anybody goes to trial in St. Clair County anymore. When they do, hardly anybody goes to trial to verdict. I think I've gotten three verdicts all year."

Apparently, the cases that linger upon the St. Clair County civil docket do so because the lawyers are not interested in trying those cases. Judge Cueto maintained that anyone who truly desires a speedy civil trial can readily receive one. Furthermore, no one countered the judge, when he commented:

"*[Y]ou can get to trial any time you want to.* You want to try a case in St. Clair County, I'm telling you I'll try it. *** [Y]ou can get to trial in St. Clair County as quickly as you can in any other county ***." (Emphasis added.)

After Reitz and Keefe argued their respective positions on the motion, Judge Cueto denied the requested transfer, and the defendants pursued this interlocutory appeal of that ruling.

Pursuant to our charge from the Illinois Supreme Court, we now review the denial of the intrastate venue transfer request in light of the principles cast in *Dawdy* and *Guerine*.

Initially, we note the distinction between the two cases, emphasized by Justice Freeman when he penned the *Dawdy* opinion:

"In *Guerine*, we concluded that the balance of the *forum non conveniens* factors did not strongly favor transfer from the plaintiff's chosen forum. We held that where the potential trial witnesses are scattered among several counties, including the plaintiff's chosen forum, and no single county enjoys a predominant connection to the litigation, the plaintiff may not be deprived of his or her chosen forum. [Citation.] ***

In this case, however, none of the witnesses reside in Madison County and Macoupin County has a predominant connection to this case. The *sole fact* that one defendant *maintains a post office box* in Madison County does not give Madison County a legitimate interest in or connection to this case." (Emphasis added.) *Dawdy*, 207 Ill. 2d at 183-84, 797 N.E.2d at 700.

Those who find the two cases difficult to reconcile should know that we would not be ordered to reconsider a venue transfer question in light of both *Dawdy* and *Guerine* if the supreme court did not think both decisions still represented good law. Whatever incompatibility does exist simply inspires a conclusion that the doctrine maintains that degree of " ' "flexibility that makes it so valuable." ' " *Dawdy*, 207 Ill. 2d at 180, 797 N.E.2d at 698, quoting *Bland v. Norfolk & Western Ry. Co.*, 116 Ill. 2d 217, 227, 506 N.E.2d 1291, 1295 (1987), quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 70 L. Ed. 2d 419, 432, 102 S. Ct. 252, 263 (1981).

Certain basic principles gird the doctrine that allows for venue

transfers based upon matters of convenience. While they hardly bear repeating, here is a reminder of the basics.

■ The doctrine is designed to achieve fundamental fairness and sensible and effective judicial administration. *Adkins v. Chicago, Rock Island & Pacific R.R. Co.*, 54 Ill. 2d 511, 514, 301 N.E.2d 729, 730 (1973). It enables trial judges to forego their jurisdictional power in those exceptional cases where a trial in another forum with proper jurisdiction and venue would better serve the ends of justice. *Vinson v. Allstate*, 144 Ill. 2d 306, 310, 579 N.E.2d 857, 859 (1991). A doctrine designed to allow trial judges to surrender their jurisdiction over cases relies heavily upon the discretion of those judges. We necessarily review the exercise of that discretion with a great deal of deference. *Guerine*, 198 Ill. 2d at 515, 764 N.E.2d at 57.

■ Numerous factors, including the private interests of the litigants and the public interests of the fora at issue, compose the definition of a convenient forum. Those factors must be weighed in their entirety in order to arrive at proper decisions on venue transfer requests. "[N]o single *forum non conveniens* factor should be accorded central emphasis or conclusive effect." *Dawdy*, 207 Ill. 2d at 180, 797 N.E.2d at 698.

The private interests of the litigants to consider are: (1) the convenience of the parties, (2) the relative ease of access to sources of testimonial, documentary, and real evidence, and (3) all other practical problems that make the trial of a case easy, expeditious, and inexpensive. *Griffith v. Mitsubishi Aircraft International, Inc.*, 136 Ill. 2d 101, 105-06, 554 N.E.2d 209, 211 (1990).

The public interests of the fora at issue are: (1) the interest in deciding localized controversies locally, (2) the unfairness of imposing the expense of a trial and the burden of jury duty on residents of a county with little connection to the litigation, and (3) the administrative difficulties presented by adding further litigation to court dockets in already congested fora. *Griffith*, 136 Ill. 2d at 106, 554 N.E.2d at 211.

■ When venue is challenged, the court must apply what has been called an "unequal balancing test," giving deference to the plaintiff's choice of forum. *Guerine*, 198 Ill. 2d at 521, 764 N.E.2d at 61, citing *Griffith*, 136 Ill. 2d at 107, 554 N.E.2d at 212. Applying that test and deferring to the plaintiff's choice of forum usually results in decisions that favor the plaintiff's forum selection. Most often, " 'the plaintiff's initial choice of forum will prevail, provided venue is proper and the inconvenience factors attached to such forum do not *greatly outweigh* the plaintiff's *substantial right* to try the case in the chosen forum.' " (Emphasis added.) *Guerine*, 198 Ill. 2d at 520, 764 N.E.2d at 60, quot-

ing *Peile v. Skelgas, Inc.*, 163 Ill. 2d 323, 335-36, 645 N.E.2d 184, 190 (1994).

The doctrine's core rationale, explained by the United States Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 91 L. Ed. 1055, 1062, 67 S. Ct. 839, 843 (1947), the seminal interstate *forum non conveniens* case, seems somewhat meaningless in the context of a transfer request to an adjacent county within the same state. Notwithstanding, the doctrine rests upon the notion that the plaintiff's forum choice "may not \*\*\* 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy." *Gulf Oil Corp.*, 330 U.S. at 508, 91 L. Ed. at 1062, 67 S. Ct. at 843.

While recognizing that a plaintiff's choice of forum was not absolute, the United States Supreme Court cautioned that "unless the balance [of convenience factors] is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp.*, 330 U.S. at 508, 91 L. Ed. at 1062, 67 S. Ct. at 843.

The Illinois Supreme Court applied the foregoing principles to two different intrastate forum transfer requests when it decided *Guerine* and *Dawdy*. *Guerine* presented the following relevant facts and their connection to Cook, De Kalb, and Kane Counties, three adjoining counties in northern Illinois.

On September 26, 1999, Richard Guerine, who lived in Cook County, traveled a De Kalb County highway hauling a boat on a trailer manufactured by an Indiana corporation. When the trailer broke away from the hitch on Guerine's truck, it collided with a car driven by Angel Malone, who lived in Kane County. Angel was rushed to the nearest De Kalb County hospital for emergency treatment, but she expired en route.

The accident was investigated by De Kalb County deputies. There were three eyewitnesses to the accident, one from Cook County, one from De Kalb County, and one from Du Page County. Angel's two minor sons, Christopher and Samuel, were in her vehicle during the accident and, like their mother, lived in Kane County. Guerine's vehicle, boat, and trailer remained in De Kalb County after the accident, presumably stored for use as evidence.

First American Bank, as the executor of Angel's estate, and Christopher and Samuel, by their father and Angel's husband Patrick, filed a wrongful death complaint in Cook County, Illinois, against Guerine and the trailer's manufacturer. Limited discovery revealed more potential witnesses who resided in Kane and De Kalb Counties. Only one witness lived in Cook County.

Upon the motion of the trailer's manufacturer, the trial judge

granted its request to transfer venue from Cook County. When granting the motion, the trial judge noted that Cook County had little connection to the case, given that the accident occurred in De Kalb County, that it was investigated by De Kalb County police officers, and that most of the witnesses were from De Kalb and Kane Counties. After giving the plaintiffs their choice of venue, they chose Kane County, where Patrick, Christopher, Samuel, and Angel's two parents lived, and promptly petitioned the appellate court for a permissive interlocutory appeal. The petition was denied. However, when it made a similar request to the supreme court, the interlocutory appeal was allowed.

In allowing the appeal, Justice Fitzgerald wrote for a unanimous court:

> "We live in a smaller world than that contemplated by the *Gulf Oil* Court, or even this court in *Torres* [*v. Walsh*, 98 Ill. 2d 338, 456 N.E.2d 601 (1983)]. Today, we are connected by interstate highways, bustling airways, telecommunications, and the world wide web. Today, *convenience—the touchstone of the forum non conveniens doctrine*—has a different meaning. [Citation.] That is, the convenience of the parties depends in large measure upon the context in which we evaluate their convenience.
>
> *** Illinois *forum non conveniens* law is admittedly less than clear. In an effort to clarify the doctrine, we hold that a trial court abuses its discretion in granting an intrastate *forum non conveniens* motion to transfer venue where, as here, the potential trial witnesses are scattered among several counties, including the plaintiff's chosen forum, and no single county enjoys a predominant connection to the litigation. The balance of factors must strongly favor transfer of the case before the plaintiff can be deprived of his chosen forum. [Citation.] This is not such a case." (Emphasis added.) *Guerine*, 198 Ill. 2d at 525-26, 764 N.E.2d at 63-64.

The second case we were ordered to consider, *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 797 N.E.2d 687 (2003), presented the following set of facts that involved the three adjoining Illinois counties of Macoupin, Madison, and Greene.

William Dawdy, Jr., lives in Greene County. Rodney Riederer lives in Macoupin County. On May 20, 1997, Riederer, while working for the Union Pacific Railroad Company (Union Pacific), drove a Union Pacific truck into a tractor being operated by Dawdy on Illinois Highway 108 in Macoupin County. Dawdy was badly hurt. He was rushed to a Springfield, Illinois, hospital for emergency room treatment.

Dawdy did not file suit in Greene County, where he lived, or in Macoupin County, where the accident occurred. Dawdy sued Riederer and Union Pacific in Madison County, Macoupin County's neighbor to

the immediate south. The resident defendant for venue purposes was Union Pacific.

This mirrored what the plaintiffs had done in *Guerine*. They filed suit in a county in which one of the two defendants resided, but not in a county where they lived or where the accident occurred. However, in *Guerine*, there was one eyewitness to the accident who lived in the plaintiff's chosen forum. In Dawdy's case, not a single witness lived in Dawdy's forum of preference.

The railroad and its employee made a request to transfer venue to Macoupin County, Illinois. They argued: " '[T]his case has absolutely no connection whatsoever with Madison County, Illinois. There is no basis or reason for filing this case in this court other than "forum shopping." ' " *Dawdy*, 207 Ill. 2d at 170, 797 N.E.2d at 692.

Dawdy countered by arguing that Madison County was just as convenient as Macoupin County. He explained that there were 18 potential witnesses, 14 of whom lived outside of Madison and Macoupin Counties. Since all of those potential witnesses had to travel significant distances, Dawdy argued that it did not matter that the witnesses would have to travel 18 miles further if the case was tried in Madison County. Dawdy also pointed out that his lawyer lived and worked in Madison County and that Union Pacific's lawyer lived much closer to Madison County.

The trial judge denied the defendants' venue transfer request. We affirmed. The Illinois Supreme Court granted the defendants' petition for leave to appeal. Writing for a majority of the court in that case, Justice Freeman observed:

> "[N]one of the potential witnesses reside in Madison County. Four out of the ten medical providers are located in Macoupin County or adjacent Greene County. The remaining six medical providers are located in either Sangamon County or Macon County, both of which are closer to Macoupin County than to Madison County. Because the location of the accident is in Macoupin County, and the locations of the identified witnesses are on a whole closer to Macoupin County than Madison County, these factors slightly weigh in favor of the convenience of Macoupin County over Madison County." *Dawdy*, 207 Ill. 2d at 178, 797 N.E.2d at 697.

In other words, almost all of the 18 identified witnesses lived closer to Macoupin County than Madison County.

Justice Freeman continued:

> "Another private interest factor is the possibility of viewing the premises, if appropriate. The appellate court apparently gave this factor no weight. ***
>
> *** Adhering to *Gulf Oil*, this court has recognized that 'the *pos-*

*sibility* of having a jury view the scene of an accident is an important consideration in ruling upon a *forum non conveniens* motion.' (Emphasis added.) [Citation.]" *Dawdy*, 207 Ill. 2d at 178-79, 797 N.E.2d at 697.

Justice Freeman noted how irrational it would be for Madison County jurors to travel to Macoupin County to view the accident scene. He felt that such a viewing would be accomplished more expeditiously if the case was tried in Macoupin County.

While not mentioned in the opinion, we note that Highway 108 emanates from Carlinville, Illinois, where Macoupin County courtrooms are located. It runs west from there to the Mississippi River. Clearly, jurors sitting in an Edwardsville courtroom would have had a much longer trek for a view of the accident scene than jurors who could drive a few miles down the road from the Macoupin County courthouse.

Although the *Dawdy* court concluded that "[o]n the whole, *** private interest factors favor the convenience of Macoupin County over Madison County" (*Dawdy*, 207 Ill. 2d at 180, 797 N.E.2d at 698), it remains unclear whether private-interest factors alone might have warranted a transfer. What seems obviously clear is that the linchpin of the *Dawdy* decision was the supreme court's finding that "public interest factors strongly weigh against Madison County as the appropriate forum in which this case should be tried." *Dawdy*, 207 Ill. 2d at 181, 797 N.E.2d at 698. Justice Freeman pointed out as follows:

"The [annual report of the Administrative Office of the Illinois Courts] for 1998 reveals that there were 1,867 jury actions for damages in excess of $50,000 pending in Madison County, while only 137 of such cases were pending in Macoupin County. Further, in such cases, the average time lapse between filing and verdict in Madison County was 29.3 months, but only 17.3 months—one year less—in Macoupin County. These statistics demonstrate that the docket of the circuit court of Madison County, through the time that plaintiff filed his complaint, continued to be 'crowded to the point where congestion is of great concern.' *Bland*, 116 Ill. 2d at 230[, 506 N.E.2d at 1297]." *Dawdy*, 207 Ill. 2d at 181, 797 N.E.2d at 699.

The supreme court also found that Madison County had little, if any, connection to the case. The sole fact that one defendant maintained a post office box in Madison County was not enough to provide a legitimate interest in the case. *Dawdy*, 207 Ill. 2d at 184, 797 N.E.2d at 700.

●4 With these two cases in mind, we examine the circumstances of the case before us—a case that mirrors *Dawdy* and *Guerine* in the sense that the plaintiff's preferred venue is not where the plaintiff

lives or where the accident occurred but, rather, an adjacent county where more lawsuits are generally filed. Our inquiry is guided by the doctrine's touchstone—convenience. Giving some amount of deference to the nonresident plaintiff's forum selection, we ask where this case is best litigated with convenience and without vexation, harassment, or oppression of the defendants.

Norfolk Southern and its employees maintain that the facts in *Dawdy* are virtually indistinguishable from the facts presented here. Moreover, they argue that unlike *Guerine*, where no single county enjoyed a predominant connection to the litigation, here Clinton County connections clearly predominate. Rita Langenhorst lives, and her deceased husband lived, in Clinton County. The crossing where the accident occurred rests just 500 feet from Rita's home, in Clinton County. A Clinton County deputy sheriff conducted the accident scene investigation. Firefighters who work in Clinton County, ambulance personnel who work for Clinton County ambulance services, and auto body repair personnel working at a Clinton County repair shop are all arguably from Clinton County. Gerald Langenhorst's two emergency room medical physicians also work in Clinton County.

Norfolk Southern and its employees also argue that public-interest factors strongly favor the requested transfer. They point out that Clinton County has a local interest in the litigation since the accident occurred at a railroad crossing located in Clinton County. They also contend that Administrative Office of the Illinois Courts annual statistics reflect the existence of congested dockets in St. Clair County, while Clinton County courtrooms remain uncrowded. The defendants set forth in their brief:

> "In 2000, there were a total of 882 civil cases opened in Clinton County. That same year, Clinton County disposed of 777 civil cases. By contrast, in St. Clair County, there were a total of 14,659 civil cases opened in 2000. In 2000, St. Clair County disposed of 13,740 civil cases."

In sum, Norfolk Southern and its employees take the position that convenience factors strongly favor a venue transfer to Clinton County, that practically everything weighs in favor of the transfer, and that no reasonable person would take the view adopted by Judge Cueto. They argue, with a slight touch of disdain:

> "In spite of [p]laintiff's choice of forum, duly constituted state courts exist in Clinton County, Illinois. These courts are more efficient, proper[,] and convenient fora for the trial of this case. The forum which plaintiff has chosen for the institution of this lawsuit is in fact convenient to no one with the exception of plaintiff's counsel."

While it is true that duly constituted state courts exist in Clinton County, Illinois, we are not so certain that they offer a more efficient forum within which to litigate this case. For that matter, we are not all that confident that they offer more convenience to the parties. However, a closer look at the circumstances of this case does find one thing with absolute certainty. Widow Langenhorst's lawyer is not the only person who would find it more convenient to try this case in St. Clair County.

We recognize that convenience to the litigants' lawyers is not a significant factor. *Dawdy*, 207 Ill. 2d at 179, 797 N.E.2d at 697. The casual treatment of this concern originated in cases of interstate transfer, where it was generally understood that other comparable counsel, closer to the transfer forum, would be hired to complete the litigation.

Regardless, this factor warrants some mention here. There are no law firms comparable to Thompson Coburn LLP with offices in the rural community of Carlyle, Illinois. Most firms skilled in championing the defense of railroad cases in this region have offices in the metro-east area of Illinois or in St. Louis, Missouri. Thompson Coburn LLP has offices in both places. In fact, its Belleville office is probably the closest office of its kind, when it comes to finding a skilled railroad defense attorney to litigate in Clinton County. In all likelihood, a transfer to Clinton County will mean a lengthy daily commute from Belleville to Carlyle for both Kurt Reitz and Tom Keefe.

In Justice Fitzgerald's shrinking world of computers, there are programs tooled and ready to measure the travel distance to various Illinois fora and generate an estimated travel time based upon the kind of roads and speed limits en route. Carlyle is 37.56 miles from Belleville. The computer-generated estimated time of travel on the quickest travel route is 55 minutes. In all likelihood, the defendants will have to pay their lawyers to drive a car two hours a day if the case is transferred to Clinton County. Moreover, instead of being only blocks away from a major Thompson Coburn LLP office housing support services during the trial, other, less convenient arrangements for staff support will have to be made. This does not seem expeditious or convenient.

The only people connected to this litigation who must spend every day of the trial in the courtroom where this case is litigated are the parties' lawyers. If convenience is the doctrine's touchstone, a venue that offers convenience to the litigants' lawyers is a venue that addresses a practical problem that makes a trial easy, expeditious, and less expensive. A courtroom blocks away from defense counsel's main office, his professional assistants, and his staff of associates is a

courtroom that tends to make trial easier, more expeditious, and less expensive for that attorney's client.

In continuing our analysis, we note one common thread in *Dawdy* and *Guerine*. When the Illinois Supreme Court transferred the venue in *Dawdy* to Macoupin County and vacated the earlier venue transfer in *Guerine*, returning the case to Cook County, trials were going to be conducted in fora where at least one defendant really lived. Here, like in *Dawdy*, the resident defendant for venue purposes is a corporation, while people who do not live in St. Clair County are also being sued. However, unlike *Dawdy*, a transfer to Clinton County will not find the litigation in a county that any of the other defendants call home. Only Norfolk Southern, the corporate defendant, is a resident of Clinton County for venue purposes.

We examine how the two potential fora fare in terms of their convenience to the Norfolk Southern employees who are being sued.

Samuel Baggett was the conductor of the train and lives in Patoka, Indiana. Keith Egmon was the train's engineer and lives in Hazelton, Indiana. Jimmy Ellis is a signal equipment division engineer and was responsible for crossing 724641H. Ellis lives in Decatur, Illinois. All three men have sworn that a trial in Clinton County would not inconvenience them.

The measure of convenience to these three defendants depends upon whether they stay for the entire trial or merely appear one day to give testimony. The means of travel is important as well.

We assume Ellis would drive to Carlyle. However, there is a possibility that Baggett and Egmon might commute by plane, if their planned appearance was for only one day in order to give testimony. If they decided to fly and to attend only one day of the trial, St. Clair County clearly offers more convenience. The Evansville, Indiana, airport is a short commute for both men. A commercial flight could be had from Evansville Airport to Lambert Field in St. Louis, followed by a much shorter drive to Belleville than to Carlyle. A chartered general aviation flight from Evansville Airport to Belleville's MidAmerica Airport would offer the most efficient means of travel. MidAmerica Airport boasts a 10,000-foot runway, uncrowded facilities, and almost immediate proximity to the St. Clair County courtrooms.

If Baggett and Egmon decided to drive, most of their trip would involve travel on Interstate 64. Ellis would arrive on Interstate 55. If the three defendants intended to be present for the entire trial, we doubt that any of them would want to commute daily to those proceedings. They would have to stay somewhere. There are three hotels within blocks of the St. Clair County courthouse and countless others just a short distance away. Such is not the case in Carlyle. While hotel

facilities can be found off several interstate exits in the general area of both counties, there are no hotels at the Carlyle-Nashville exit. Most of the well-known hotel chains can be found in clusters around the St. Clair County exits, far closer to the St. Clair County courthouse than the Clinton County courthouse.

Baggett's drive from his home in Patoka, Indiana, to Carlyle, Illinois, would cover a distance of 141.88 miles. The computer-generated estimated time of travel would be 2 hours and 31 minutes. The drive from his home to Belleville, Illinois, would cover 159.37 miles with an estimated time of travel spanning 2 hours and 38 minutes.

Similarly, Egmon's drive from his home in Hazelton, Indiana, to Carlyle, Illinois, would cover a distance of 146.89 miles. The computer-generated estimated time of travel would be 2 hours and 51 minutes. The drive from his home to Belleville, Illinois, would cover 164.38 miles with an estimated time of travel spanning 2 hours and 58 minutes.

Baggett and Egmon have stated under oath that Clinton County will not be inconvenient for them. The only inconvenience that St. Clair County could conceivably offer either of them is a seven-minute longer drive, if either of them choose to drive to the area for the trial. We think it fair to assume from their affidavits that St. Clair County would not be inconvenient either.

The same can be said for Ellis. Ellis's drive from his home in Decatur, Illinois, to Carlyle, Illinois, would cover 100.78 miles and take an estimated 2 hours and 11 minutes. The drive to Belleville would cover 143.83 miles. Because of more interstate driving, the computer-generated estimated time of travel spans only 2 hours 23 minutes. The measure of added inconvenience in traveling to Belleville as opposed to Carlyle is 12 minutes.

Again, the only conceivable inconvenience that the plaintiff's chosen forum presents is minuscule. Ellis has stated under oath that Clinton County would not be inconvenient. Based upon that sworn statement, it is fair to assume that St. Clair County would not inconvenience him as well.

We now turn to an examination of the relative ease of access to proof. We are not told where the unidentified firefighters, ambulance personnel, or auto body repair personnel live. Nor are we told how their testimony would be relevant to the litigation. However, the two St. Joseph's Hospital emergency room physicians who treated Gerald Langenhorst shortly after the accident appear to be key witnesses in the case. They took a medical history from Gerald Langenhorst in which he gave his explanation of the accident, they diagnosed the extent of his injuries, and they treated his wounds before he was

airlifted to St. Louis. While both doctors work in Clinton County, neither doctor lives there.

Dr. Keith Thomae lives in Madison County. Dr. David Sorge lives in St. Clair County. They live closer to the St. Clair County courthouse than the Clinton County courthouse. Either witness's live testimony could be scheduled in a manner that would make a visit to the St. Clair County courthouse equally, if not more, convenient than a trip to the Clinton County courthouse.

Mark Heffernan, the plaintiff's investigator, is a retired detective who worked for the Belleville police department and now engages in private investigation work. He lives in Belleville, only minutes from the St. Clair County courthouse. By everyone's account, he is expected to give extensive testimony about his investigation of the accident scene immediately after the fatal crash. Photographs and precise diagrams of the scene will be offered into evidence through his testimony in an attempt to provide an accurate picture of how the accident scene looked on July 27, 2001.

As Justice Freeman emphasized in *Dawdy*, the *possibility* of a jury view of an accident's location is an important consideration in determining whether to transfer a case. However, the possibility of a jury view of the premises where an accident took place is a valid consideration *only where a jury view of the premises would be appropriate*. Here, a jury view of the crossing would seem decidedly inappropriate.

An understanding of how the scene appeared on July 27, 2001, is necessary to a fair assessment of the plaintiff's case. Subsequent remedial repairs were made to the crossbuck in question and to the vegetation growth along the tracks. More important, the 2001 weather grew a mature corn crop that, by July 27, 2001, was every bit as high as an elephant's eye.

That cornfield, as it existed on July 27, 2001, is central to the plaintiff's claim about the sufficiency of the warning that Gerald Langenhorst received. Because of that year's corn crop, and its location, Gerald could not see a train's approach from the west. The only fair warning of a train's approach would come from the sound that it made in advance of the crossing.

Since the crossing looked unquestionably different on July 27, 2001, a view of the area now would harbor a potential to mislead and to distort an understanding of those factors that potentially contributed to the crossing accident.

Even if the possibility of a jury view found appropriate circumstance, the situation is not as irrational as that which the Illinois Supreme Court confronted in *Dawdy*. Because the accident scene is so

close to the border between St. Clair and Clinton Counties, jurors would only have to travel approximately nine miles further to examine the crossing and the surrounding Langenhorst farm. Such a disparity offers little inconvenience or added expense.

There were other medical providers in this case. They work in St. Louis. So does the medical examiner who performed the autopsy. We are not told where they live. We suspect that if any of them commuted to St. Louis University Hospital from Clinton County, it would have found mention by one of the defendants, just as the commute of Dr. Thomae and Dr. Sorge found mention by the plaintiff.

The plaintiff maintains that her chance of obtaining the voluntary attendance of these potentially out-of-state witnesses would be much better in a forum substantially closer to where they live and work. She also points out that most of the medical evidence in this case would be as easy, if not easier, to access in St. Clair County, clearly distinguishing this case from the situation confronted in *Dawdy*. There, every single medical provider was inconvenienced by the plaintiff's forum selection.

The defendants point to all the potential witnesses who live in or around Germantown and Albers, in Clinton County. They argue that the majority of the witnesses, the location of the accident, and the residence of Rita Langenhorst are connections that combine to make Clinton County the predominant county and, thus, a county to which a venue transfer must be made. They rely on the *Guerine* case to support the argument.

The concept of predominance mentioned in *Guerine* must be examined from the context of the doctrine—the touchstone of which is convenience. The Illinois Supreme Court declared it an abuse of discretion to transfer venue where none, in a series of potential venues, was in a clearly superior position to provide the most convenient forum in which to litigate and to thus overcome the plaintiff's substantial right to select venue.

In *Guerine*, the supreme court confronted a case where the majority of witnesses, including the accident's investigating officers, lived in De Kalb County. The alleged defective product was stored in De Kalb County. The accident occurred in De Kalb County. Only one potential witness lived in Cook County, the plaintiff's forum of choice. Moreover, the plaintiff did not live in Cook County. Under these circumstances, a unanimous supreme court did not find that De Kalb County possessed the kind of predominant position to provide the improved convenience necessary to trump the doctrine's deference to the plaintiff's choice.

Here, two potential witnesses live in St. Clair County, the lawyers who will try this case both have offices just minutes away from St.

Clair County courtrooms, and all the doctors who treated Gerald Langenhorst live in or closer to St. Clair County. We do not think that *Guerine* supports a transfer to Clinton County.

We turn to an examination of the public-interest arguments being made in favor of Clinton County over St. Clair County. In *Dawdy*, Justice Freeman looked at the statistics that addressed major civil cases filed in Madison and Macoupin Counties for the year 1998, and he determined that they strongly favored a venue transfer to Macoupin County.

Here, the defendants argue a docket comparison for the year 2000 that deals with everything, save criminal cases, filed with the St. Clair County and Clinton County circuit clerks. We note that St. Clair County fared rather well in terms of the ratio of cleared cases to new cases filed during that time. However, we are not really concerned with congestion due to divorces, orders of protection, or small claims cases.

When we examine the potential congestion that matters—those civil cases seeking damages in excess of $50,000—we discover that St. Clair County and Clinton County courtrooms are just about on equal footing. Both constitute efficient venues.

According to the Administrative Office of the Illinois Courts year 2000 annual report, 802 civil cases with more than $50,000 in controversy were filed and docketed in St. Clair County during the year 2000. During the same time, St. Clair County judges disposed of 854 major civil cases and removed them from St. Clair County dockets. Clinton County had 41 new filings of major civil cases in the year 2000. It disposed of 44 major civil cases during the same time. St. Clair County cleared 106% of its major civil cases, while Clinton County cleared 107% of its major civil cases. The 1% difference in favor of Clinton County does not raise concern over St. Clair County court congestion. This is not like the disparity in pending major civil cases that existed between Madison and Macoupin Counties.

We note that St. Clair and Madison Counties compose most of what is known as the metro-east area of the State of Illinois. While the two counties are often treated like Siamese twins, their major civil dockets are markedly different. The St. Clair County dockets are simply not " 'crowded to the point where congestion is of great concern.' " *Dawdy*, 207 Ill. 2d at 181, 797 N.E.2d at 699, quoting *Bland*, 116 Ill. 2d at 230, 506 N.E.2d at 1297.

Certainly, Clinton County and its residents possess a local interest in this railroad crossing accident case. It happened in Clinton County. This is a public-interest factor that favors suit where the accident occurred in every civil case ever filed.

The residents of Clinton County have an interest in how Norfolk Southern maintains its country crossings. Crossings like the one at issue here can be found throughout Clinton County and its almost universally rural environs. Residents want those crossings to remain free from visual obstruction caused by weeds and vegetation. They also want assurance that approaching trains will provide adequate warning when they approach crossings guarded only by crossbucks.

This is not to say that St. Clair County residents do not share the same interests. The crossing accident in this case is not a completely localized controversy. The Norfolk Southern line that passes through the Langenhorst farm bisects all of St. Clair County, most of which consists of rural farmlands and country roads with railroad crossings identical to crossing 724641H. The local public interest in this suit is not entirely unto Clinton County residents. For the same reason, it would not necessarily burden St. Clair County residents to serve on a jury that decided the issues raised by this railroad crossing accident case.

For the foregoing reasons, we cannot say that Judge Cueto was unreasonable in denying a venue transfer to Clinton County. Other reasonable people might well adopt the view that he has taken here, that the convenience factors do not strongly favor a transfer of the case. Indeed, given the Illinois Supreme Court's decision in *Guerine*, it might well have constituted an abuse of discretion had Judge Cueto decided to transfer the case pursuant to the defendants' request.

Affirmed.

DONOVAN, P.J., and CHAPMAN, J., concur.